UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**PABLO ANTONIO GARCIA**,

    Plaintiff,

v.                                                                           Case No. 8:22-cv-1987-WFJ-UAM

**EQUIFAX INFORMATION SERVICES, LLC**; **TRANS UNION, LLC**; **EXPERIAN INFORMATION SOLUTIONS, INC.**; and **SYNOVUS BANK**,

    Defendants.
_____/

## ORDER

Before the Court is Defendant Synovus Bank's (the "Bank") Motion for Summary Judgment (Dkt. 91). Plaintiff Pablo Garcia has responded in opposition (Dkt. 99), and the Bank has replied (Dkt. 105). Upon careful consideration, the Court denies the Bank's Motion.

## BACKGROUND

This action focuses on the Bank's charge-off of Mr. Garcia's credit account and the Bank's subsequent reporting of the charge-off to third-party credit reporting agencies ("CRAs"). Mr. Garcia contends that the Bank's reporting was inaccurate or incomplete, and that the Bank's post-complaint investigation into its reporting was unreasonable. The Bank disagrees on both points.

I.    **Factual History**

Between 2015 and 2018, the Bank entered into two loan agreements with Kandela Productions Inc. (the "Kandela Loans") and one loan agreement with Real Rebate Realty LLC (the "Real Rebate Loan") (collectively, the "Business Loans"). Dkt. 93-2 at 11–25. Mr. Garcia signed the Kandela Loans in his capacity as Kandela's President and the Real Rebate Loan in his capacity as Real Rebate's Managing Member. *Id.* In addition, Mr. Garcia executed a guaranty for each of the Business Loans in his personal capacity. *Id.* at 27–38.

On July 10, 2017, the Bank also entered into a Consumer Revolving Line of Credit Agreement with Mr. Garcia (the "LOC Agreement"). *Id.* at 40–45. The LOC Agreement essentially created a $24,950.00 personal line of credit for Mr. Garcia under a loan account ending in Nos. 3082 (the "Personal Account"). Dkt. 93 at 2; Dkt. 100 at 2. In relation to default, the LOC Agreement provided the following:

> Time is of the essence of this Agreement, and if I fail to pay when due any payment required to be made on my Account or fail to comply with any other duty or obligation to Bank herein or otherwise undertaken by me, or if I die, or if there is any change in circumstance that Bank shall reasonably believe to impair my ability to pay when due all of my indebtedness hereunder, or if any financial information or other representation at any time given or made to Bank is false, incomplete or misleading in any material respect when given or made by me, or if there is any other occurrence or event constituting a default on my part under the terms of my separate Security Agreement (if any), I will be in default and Bank may at its option at any time and without notice or demand: (a) Terminate its commitment to make

>further Loan Advances and refuse to honor checks drawn on my Account; (b) Accelerate and declare immediately due and payable all sums remaining unpaid on my Account, and if my credit privileges under this Agreement have been permanently terminated; all of my debt thus accelerated will bear interest thereafter at a rate amounting to 2% more than the rate otherwise applicable to my Account; (c) Appropriate and apply toward payment of such debt any and all accounts, deposits, balances, credits, items, and monies in which Bank holds a security interest hereunder; and/or (d) Exercise any and all other rights and remedies herein or in my Security Agreement provided or otherwise available to Bank under applicable law. Any and all such remedies may be exercised in such manner and sequence as Bank may elect.

Dkt. 93-2 at 43–42.

By January 29, 2021, issues had arisen with one of the Kandela Loans. The Bank sent Mr. Garcia a letter of default, *id.* at 47, as well as an email correspondence indicating what information the Bank would need in order to consider restructuring the loan, Dkt. 100-1 at 2–3. Mr. Garcia responded by explaining that he was unexpectedly stuck abroad due to COVID-19 complications. *Id.* at 2. He maintains that he was unable to furnish the requested documents for the same reason. Dkt. 93-3 at 13.

By May 18, 2021, all three Business Loans were in default. The Bank consequently sent additional letters and informed Mr. Garcia that the subject issues would need to be addressed within 10 days. Dkt. 93-2 at 47–56. Mr. Garcia failed to cure the defaults or otherwise restructure the Business Loans with the Bank. Dkt. 93 at 4; Dkt. 100 at 3.

On August 24, 2021, the Bank decided to charge-off the Business Loans and the Personal Account, which together comprised Mr. Garcia's entire loan relationship with the Bank. Dkt. 93-2 at 58. The Bank offered the following explanation for its decision:

> Pablo Garcia is the owner and guarantor of Kandela Productions, a commercial signage company. There are two loans to Kandela Productions: an unsecured BALOC that matured on 9/20/2020, and an unsecured term loan that matured on 8/15/2021. Real Rebate Realty is Mr. Garcia's real estate business, with a BALOC that matured on 7/8/2021. The loan to Pablo Garcia is a PLOC, which is the only loan that remains current. Mr. Garcia informed the bank that during a holiday trip his family tested positive for COVID and were stuck abroad for several months, affecting his businesses. He indicated that he would be returning home in May 2021, but has remained unresponsive to calls, emails, and letters. Charge-off of the entire $134,179 relationship is recommended due to all the loans being unsecured, the severe delinquency of the small business loans, and the fact that Mr. Garcia is unresponsive and the common source of repayment for all four loans. The four loans will be referred to Recovery for further collection.

*Id.* at 58. As explained above, the Personal Account, or "PLOC," was charged off notwithstanding its current status. There is no indication that Mr. Garcia was ever more than one month late in making payments under the Personal Account. *See generally* Dkt. 99-2.

Following the charge-off, Mr. Garcia's credit scores "dropped substantially." Dkt. 30 at 4; Dkt. 93 at 5. Accordingly, on September 5, 2021, he sent a dispute letter to the Bank explaining that the Personal Account charge-off was "inaccurate because I have NEVER missed a payment and [the Personal Account] is 100% up

4

to date and in good standing." Dkt. 93-4 at 2. On June 1, 2022, Mr. Garcia lodged formal credit disputes with former co-defendants Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax"), and Trans Union, LLC ("Trans Union"). *See generally* Dkt. 93-5. And, on August 23, 2022, Mr. Garcia's attorney informed the bank of a formal dispute concerning the Personal Account and Mr. Garcia's intent to file suit. Dkt. 93-7 at 2.

In response to Mr. Garcia's direct dispute and automated credit dispute verifications ("ACDVs") from the aforementioned CRAs, the Bank investigated its charge-off of the Personal Account. The Bank's investigation led it to conclude that its reporting was "accurate" and that the account status should be reported as "CHARGE OFF/CURRENT[.]" Dkt. 93 at 8; Dkt. 93-2 at 63–71. That said, it is not entirely clear from the ACDVs when the Bank began reporting the Personal Account as "CHARGE OFF/CURRENT."[1] And initial reporting from the subject CRAs seemingly indicates only that the Personal Account was "charged-off" or "charged-off as bad debt." *See* Dkt. 91-2 at 141, 234, 286, 347.

## II. Procedural History

On August 29, 2022, Mr. Garcia brought suit. Dkt. 1. He filed an Amended Complaint against Equifax, Trans Union, Experian, and the Bank approximately

---

[1] Mr. Garcia provides a number of ACDV responses that the Bank submitted prior to October 5, 2022, which do not qualify the Personal Account status as "CHARGE OFF/CURRENT" or "CHARGE OFF/COFF PAYING." Dkt. 99-5 at 2–7. Each of the ACDV responses provided by the Bank qualify the Personal Account as such, but the earliest response date indicated is September 8, 2021. *See* Dkt. 93-2 at 63.

5

one month later. Dkt. 30. The Bank is the only remaining defendant and Count VII is the only remaining claim. Dkt. 45; Dkt. 47; Dkt. 60. Therein, Mr. Garcia alleges that the Bank violated the Fair Credit and Reporting Act ("FCRA"), 15 U.S.C. § 1681s–2(b). Dkt. 30 at 29–33.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material

6

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

"The FCRA is a consumer protection act[,]" *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1312 (11th Cir. 2018), that seeks to ensure "fair and accurate credit reporting[,]" 15 U.S.C. § 1681(a)(1). To achieve this end, the FCRA imposes duties on the CRAs who generate consumer credit reports, as well the entities that furnish credit information to CRAs. *See id.* §§ 1681i, 1681s–2. Specifically, furnishers—such as the Bank—are required to "(1) report accurate information to CRAs regarding consumers . . . and (2) conduct an investigation after receiving notice from a CRA of a dispute lodged by a consumer regarding

7

information provided by the furnisher[.]" *Felts*, 893 F.3d at 1312 (citations omitted).

Although consumers "have no private right of action against furnishers for reporting inaccurate information to CRAs regarding consumer accounts[,]" *id.*, consumers do have a private right of action against furnishers under section 1681s–2(b) for failure to conduct a reasonable investigation and to correct inaccurate or incomplete information following an investigation, *see Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 149 (4th Cir. 2008); *Bauer v. Target Corp.*, No. 12-cv-00978-AEP, 2013 WL 12155951, at *6 (M.D. Fla. June 19, 2013). To succeed on a section 1681s–2(b) claim, a plaintiff must generally demonstrate four things: (1) the furnisher reported inaccurate or incomplete information to CRAs; (2) the plaintiff notified the subject CRAs; (3) the CRAs notified the furnisher of the reported dispute; and (4) the furnisher failed to adequately investigate the alleged inaccuracies "or otherwise failed to comply with the requirements of 15 U.S.C. § 1681s–2(b)(1)(A)(E)." *Mosley v. Monterey Fin. Servs., LLC*, No. 116-CV-03614-MHC-AJB, 2017 WL 8186861, at *3 (N.D. Ga. May 10, 2017), *report and recommendation adopted*, No. 1:16-CV-3614-MHC, 2017 WL 8217628 (N.D. Ga. June 23, 2017). The first three factors are essentially prerequisites that trigger a furnisher's duties to investigate and correct its reporting.

*See Felts*, 893 F.3d at 1313; *Arianas v. LVNV Funding, LLC*, 54 F. Supp. 3d 1308, 1311 (M.D. Fla. 2014).

At issue here is (1) whether the Bank reported inaccurate or incomplete information to Equifax, Trans Union, or Experian, and (2) whether the bank conducted an adequate investigation following Mr. Garcia's disputes. Dkt. 91 at 7–12. The Court will address each point in turn before shifting to consider damages.

### I.     The Bank's Reporting

Because section 1681s–2 does not define what constitutes accurate reporting, courts applying this provision have often looked to suits brought against CRAs under section 1681e(b) to understand accuracy in the furnisher context. *See, e.g.*, *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 37–38 (1st Cir. 2010); *Saunders v. Branch Banking And Tr. Co. Of VA*, 526 F.3d 142, 148 (4th Cir. 2008). Thereunder, CRAs are required to strive for "maximum possible accuracy" in their reporting, which the Eleventh Circuit has interpreted to mean the reported information "must be factually true and also unlikely to lead to a misunderstanding." *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020); *see also Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998); *Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 942 (6th Cir. 2020); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009). This means that reported information is inaccurate if it is "factually

incorrect, objectively likely to mislead its intended user, or both." *Erickson*, 981 F.3d at 1252.

Material issues of fact preclude the Court from finding that the Bank's reporting was wholly accurate or not objectively likely to mislead creditors. The LOC Agreement gave the Bank a number of rights in the event that Mr. Garcia failed to comply with any duty thereunder or any duty otherwise undertaken by him. Dkt. 93-2 at 58. When Mr. Garcia failed to make timely payments on the Business Loans, the Bank exercised its right to charge-off Mr. Garcia's entire loan relationship. *Id.* at 58. It also exercised its right to accelerate the Business Loans. *Id.* at 47–54. There is, however, a material issue of fact surrounding whether the Bank actually accelerated Mr. Garcia's Personal Account. Indeed, Mr. Garcia's September 9, 2021, Personal Account statement, issued only two weeks after the Bank's charge-off, provided a "Current Amount Due" figure of $434.37, a "Past Due Amount" figure of $0.00, and a loan maturity date of July 10, 2027. Dkt. 99-2 at 35. Notwithstanding slight variations in "Current Amount Due" figures, Mr. Garcia's subsequent Personal Account statements provided the same. *Id.* at 35–47.

This is important for two reasons. To begin with, it suggests a factual inaccuracy in the Bank's credit reporting that is further evinced by a comparison of Mr. Garcia's Personal Account Statements and the CRAs' credit reports. On February 7, 2022, the Bank sent Mr. Garcia a Personal Account statement that

provided a past due amount of $407.89, which became $0.00 by the next months' statement. *Id.* at 39–40. On February 25, 2022, however, Equifax was reporting the Personal Account as having a past due amount of $20,252. Dkt. 91-2 at 143. The Personal Account statements of July and August 2022 provided a past due amount of $0.00. Dkt. 99-2 at 43–44. At the same time, on August 1, 2022, Equifax was reporting a past due amount of $17,725. Dkt. 91-2 at 235. A review of the subject financial records demonstrates a continuation of this pattern. More importantly, though, a review of the provided ACDVs provides an explanation. Namely, on August 8, 2022, the Bank was reporting to Equifax that the Personal Account had a past due balance of $17,725. Dkt. 94-5 at 2. It sent Mr. Garcia a Personal Account statement the day earlier with a past due amount of $0.00. Dkt. 99-2 at 45.

These apparent inaccuracies contribute to a reasonable likelihood of confusion. As other courts have explained, materially misleading omissions in a furnisher's reporting can result in liability even where technical accuracy is achieved. *See Bauer*, 2013 WL 4054296, at *3; *Saunders,* 526 F.3d at 150. Mr. Garcia complains of two omissions: (1) the omission of information indicating the Personal Account's current status in a number of the Bank's early reports; and (2) the omission of information related to Mr. Garcia's continuing dispute of the charge-off's propriety. *See* Dkt. 99 at 5–12. The thrust of his argument is that, within the context of the Personal Account's charge-off, the omission of this

11

information was likely to mislead creditors into believing that Mr. Garcia was incapable of paying his debt and therefore not a good credit-risk.

Although the Court has reservations about these arguments in isolation, the aforementioned issue of factual accuracy renders them persuasive. Even if it is true, as the Bank's expert suggests, that creditors understand charge-offs to result from a plethora of issues, *see generally* Dkt. 94-1, a reasonable jury may believe that a creditor could have mistakenly interpreted the Personal Account charge-off as being related to Mr. Garcia's payment of the Personal Account itself. This conclusion naturally follows from a reported charge-off that carries with it an amount past due figure that equals the entire account balance figure. Many of the Bank's ACDV responses, moreover, reported just that. Dkt. 94-4 at 2; Dkt. 94-5 at 2; Dkt. 94-6 at 2. Of course, the Court recognizes that some of the Bank's later ACDV responses qualified the Personal Account as "CHARGE OFF/CURRENT." Dkt. 93-2 at 63–72. But this still arguably left creditors in a position of assessing credit risk based on seemingly contradictory information. And an issue of fact persists concerning whether a creditor would have chosen to rely on the "CHARGE OFF/CURRENT" designations or the relayed information showing Mr. Garcia's amount due figure equaling the Personal Account's balance. This is a question for the jury to resolve, not the Court. *See Matsushita*, 475 U.S. at 587; *Bauer*, 2013 WL 4054296, at *3.

## II. The Bank's Investigation

The next issue to consider is the adequacy of the Bank's post-dispute investigation. With respect to a furnisher's duty to investigate, the Eleventh Circuit has given the following guidance:

> Upon receipt of a notice from a CRA that a consumer disputes the completeness or accuracy of any information provided by a furnisher, the furnisher must (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided by the CRA; and (3) report the results of the investigation to the CRA. *See id.* § 1681s–2(b)(1). If the furnisher finds, following an investigation, that an item of information disputed by a consumer is incomplete, inaccurate, or cannot be verified, the furnisher must either modify, delete, or permanently block reporting of that information. *See id.* § 1681s–2(b)(1)(E). Further, with respect to information the furnisher finds to be inaccurate or incomplete, the furnisher also must report those results to all other CRAs. *See id.* § 1681s–2(b)(1)(D).
>
> Section 1681s–2(b) thus "contemplates three potential ending points to reinvestigation: verification of accuracy, a determination of the inaccuracy or incompleteness, or a determination that the information 'cannot be verified.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1301–02 (11th Cir. 2016) (quoting 15 U.S.C. § 1681s–2(b)(1)(E)). A furnisher may verify that the information is accurate by "uncovering documentary evidence that is sufficient to prove that the information is true," or by "relying on personal knowledge sufficient to establish the truth of the information." *Id.* at 1303.

*Felts*, 893 F.3d at 1312.

It is also important to note that the appropriate "touchstone" for evaluating investigations under section 1681s–2(b)(1) is "reasonableness[.]" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d at 1302. "Whether a furnisher's investigation

13

is reasonable will depend in part on the status of the furnisher—as an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer—and on the quality of documentation available to the furnisher." *Id.* Either way, "a plaintiff asserting a claim against a furnisher for failure to conduct a reasonable investigation cannot prevail on the claim without demonstrating that *had* the furnisher conducted a reasonable investigation, the result would have been different; *i.e.*, that the furnisher would have discovered that the information it reported was inaccurate or incomplete[.]" *Felts*, 893 F.3d at 1313.

At this stage, the Court cannot declare the Bank's investigation "reasonable." As a preliminary matter, there is a material issue of fact concerning whether the bank even reviewed all of its pertinent records. In the preceding section, the Court explained at length that there was a significant discrepancy between Mr. Garcia's Personal Account statements and the ACDV responses that the Bank provided to Equifax following its investigation. There is no question, as Mr. Garcia's original creditor and the originator of the Personal Account statements, that the Bank had access to these records. The Bank admits as much. Dkt. 94-2 at 8. The Bank inexplicably failed to catch the subject discrepancies, modify them, delete them, or otherwise remedy the situation. Mr. Garcia plausibly

suggests that the Bank failed to properly review all of Mr. Garcia's Personal Account documentation. These are issues for the trier of fact.

This brings the Court to a more general point concerning the investigation that the Bank necessarily did complete. As Mr. Garcia notes, it is unreasonable for a furnisher to investigate a dispute by merely rubber-stamping the validity of its original report. *See Hinkle*, 827 F.3d at 1302; *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1156 (9th Cir. 2009) (explaining that "[a] provision that required only a cursory investigation would not provide [adequate] protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions"); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012) (elaborating on agreement between the circuit courts concerning the fact that "investigation" under section 1681s–2(b)(1) denotes "something more than a merely cursory review"). For the reasons explained above, Mr. Garcia has shown a reasonable inference that this is essentially all the Bank did in completing its investigation of Mr. Garcia's charge-off. The Court is required to draw this inference in Mr. Garcia's favor on summary judgment, as he is the non-movant. *Skop*, 485 F.3d at 1136. As a result, summary judgment on the two liability issues is denied. The Bank may present its case at trial.[2]

---

[2] The Court recognizes that a number of inferences adverse to Mr. Garcia's position could be drawn from the evidence currently in the record. Although a multi-defaulter, Mr. Garcia has

### III.  Damages

The final issue to consider is damages. The Bank maintains that Mr. Garcia cannot prove that he experienced credit related damages or emotional/physical damages. *See generally* Dkt. 91 at 12–21. On this record, the caselaw appears to the contrary.

While a "[p]laintiff cannot plausibly allege damages based on [a furnisher's] failure to conduct a reasonable investigation where the reported information was accurate and complete[,]" *Leones v. Rushmore Loan Mgmt. Servs. LLC*, 749 F. App'x 897, 902 (11th Cir. 2018), there has been no such finding here. Additionally, Mr. Garcia has presented sufficient evidence from which a jury could infer that he suffered credit denials and other financial damages because of the Bank's reporting. *See* Dkt. 99-8 at 2–3 (Mr. Garcia's expert report); *see generally* Dkt. 91-2 at 3–48 (Mr. Garcia's deposition testimony). It follows that Mr. Garcia *might* be able to claim financial damages, notwithstanding his spotty record and defaults. *See Enwonwu v. Trans Union, LLC*, 364 F. Supp. 2d 1361, 1365–66 (N.D. Ga. 2005), *aff'd*, 164 F. App'x 914 (11th Cir. 2006) (finding that an "FCRA plaintiff must produce sufficient evidence from which a reasonable trier of fact could infer that the inaccurate entry was a "substantial factor" that brought about the denial of

---

"come forward with specific facts showing that there is a genuine issue for trial." *Shaw*, 884 F.3d at 1098. The Court is therefore without power resolve this case at the summary judgment phase.

credit" but that "he need not eliminate the possibility that correct adverse entries or any other factors also entered into the decision to deny credit").

Moving forward, the Eleventh Circuit has found that "[a] fact finder might well conclude that [a defendant's] FCRA violation caused [a plaintiffs'] additional emotional distress" even where that theory is only supported by the plaintiff's testimony and other circumstantial evidence. *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1304–05 (11th Cir. 2019) (reversing summary judgment that denied a claim of emotional distress damages related to an alleged FCRA violation). In the instant case, Mr. Garcia provides testimony concerning his alleged emotional distress damages, *see generally* Dkt. 91-2 at 3–48, as well as medical records that might suggest worsening symptoms following the Bank's allegedly inaccurate reporting, *see generally* Dkt. S-92 (sealed medical records). It is for the finder of fact to determine whether these damages are sufficiently proven. Summary judgment is denied.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) Defendants' Motion for Summary Judgment (Dkt. 91) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, on April 19, 2024.

                                        */s/ William F. Jung*
                                        **WILLIAM F. JUNG**
                                        **UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record